Filed 6/6/25  In re I.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re I.S. et al., Persons Coming Under the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085125 |
| Plaintiff and Respondent, | (Super. Ct. No. DPRI2400030) |
| v. | OPINION |
| J.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Julie Jarvi, Deputy County Counsels, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant and appellant, J.S. (Father) appeals from the juvenile court's dispositional order denying his request that his 12-year-old daughter, C.S., be returned to his care.[1] We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

The family came to the attention of plaintiff and respondent, the Riverside County Department of Public Social Services (DPSS) in November 2023, after a referral was received indicating law enforcement had responded to Mother's home due to a domestic violence altercation. Father had tackled Mother in response to her removing a piece of paper from Father's hand. A maternal uncle told Father to leave and contacted law enforcement. Then, 11-year-old C.S. was in the home, and heard the incident and Mother crying afterwards.

When the social worker interviewed C.S. at her school, C.S. reported that her parents were divorcing and living separately. C.S. lived primarily with Mother and her 16-year-old sister, I.S. C.S. indicated that if she had a choice, she would stay with Mother permanently. C.S. noted that Father had been taken away by police a few days

---

[1] D.S. (Mother) is not a party to this appeal, and C.S.'s 16-year-old sister I.S. is not a subject of this appeal.

[2] The facts and background up to Father's first appeal are from our prior opinion. (*In re I.S.*, (Jan. 08, 2025, E083846) [nonpub. opn.].)

prior because he went to Mother's home in violation of a Criminal Protection Order (CPO). The CPO against Father was issued in July 2023 after he had broken I.S.'s arm in March 2023.

When the social worker made contact with Father, he expressed concern regarding DPSS's "lack of appropriately educated staff" and stated C.S. needed help for self-harm. He reported that he had been unable to locate appropriately qualified individuals to treat C.S.'s mental health issues and expressed that "'only the most brilliant minds,' had the ability to understand what he believed was, 'very advanced,' family systems." Father described how he had studied psychology and had been treated by leading researchers of this type of psychology. He explained that he had years' worth of notes that would serve as proof as to how Mother's parenting strategies had caused the children to hate him and mentioned several times that the children had been abusive to him. He maintained that everyone thought he was crazy but this was because they did not understand the complex psychology at play.

On December 7, 2023, DPSS received a referral indicating that C.S. had taken pills at Father's home on December 5th with the intent of taking her life. Father dragged C.S. throughout the home after learning of Mother's intent to pick her up due to her reported suicidal ideation. C.S. stated that Father had mentally abused her by isolating her and had physically abused her in the past. After this incident, C.S. stayed at Operation SafeHouse.

The social worker interviewed C.S. again on December 8, 2023. C.S. appeared to have a flat affect and did not express emotion. She stated that Father would hit her approximately every two months and that she had sustained marks or bruises at least 15 times in the past. She noted that her parents hated each other and that approximately one month earlier Father had thrown Mother to the floor. Father had also thrown I.S. to the ground in 2023. C.S. also reported that law enforcement had been to the home approximately 15 times due to arguments between the parents and I.S., and that Father drank two to five beers a day and had driven her while drunk in the past.

C.S. had been diagnosed with Post Traumatic Stress Disorder (PTSD) during the summer of 2023, and was prescribed medication, which she did not take. She reported previously being in therapy, but Father would cancel her appointments. She did not feel safe in Father's home. C.S. confirmed that Father had dragged her out of her room and tried to suffocate her with his body weight the prior week. She noted that he last tried to suffocate her with his body three to four weeks earlier. C.S. disclosed that she was going to kill herself on December 5, 2023. However, Mother found the pills she took from Father's home and disposed of them. Mother locked up all of the medication and knives at her home. C.S. admitted to ongoing self-harm by cutting herself with blades that she found and stated that she would hurt herself again if she had to return to Father. She explained that Father made her life horrible and she was mostly angry when she was at his home.

4

Mother was interviewed and reported that she had been married to Father for 17 years but they were in the process of divorcing. There were no custody orders and Father could see the children whenever he wanted, but there was a CPO between I.S. and Father. Mother denied any domestic violence between her and Father, but confirmed they yelled during arguments because Father wore hearing aids. Mother indicated that C.S. rebelled against Father and that Father was unable to deal with her behaviors. Mother was unable to get the children into therapy because Father would cancel any appointments that were scheduled. Father believed that no therapist was qualified enough to treat the children. Mother expressed ongoing concern for C.S. while she was at Father's home because C.S. had issues following Father's rules and he would not feed her well. Mother would not allow C.S. to go back to Father's home after C.S. stated that she would kill herself if she went back. Hence, Mother took C.S. to Operation SafeHouse to keep her safe from both herself and Father. Mother noted that C.S. had obtained pills from Father's home and took them back to Mother's home. When Mother found the pills, she disposed of them.

I.S. told the social worker that she was worried about C.S.'s mental health because C.S. would cut herself and self-harm when she was with Father. I.S. was also concerned for C.S.'s safety because Father became aggressive while wrestling on the floor and he had put his body weight on her.

On December 15, 2023, Mother applied for custody of the girls. However, on December 22, 2023, Mother filed to dismiss the custody request.

On January 10, 2024, the social worker received an email from a social worker in North Carolina. Attached to the email was a child protective service (CPS) intake report regarding an incident in North Carolina between C.S. and Father. It was alleged that C.S. used the hotel lobby telephone to call Mother who was in Colombia and told Mother that she would continue to cut herself if she had to stay with Father. C.S. indicated that she had cut herself with a blade in a pencil sharpener due to the physical and mental abuse by Father, and she would not stop cutting herself until she returned to Mother's care. Mother reported that Father had taken C.S. and she did not know where they were located. Father reported that there were no custody orders and he was unaware C.S. harmed herself.

On January 11, 2023, Father informed the social worker that he was back from North Carolina and C.S. was in his care. He agreed to bring C.S. with him to DPSS's office. The social worker met with C.S. and Father. C.S. stated that Mother had "'forced'" her to go to dinner with Father and that Father ended up taking her to a hotel and then they flew to North Carolina the next day. While in North Carolina, C.S. used a razor from a pencil sharpener to cut her thighs, which she did because she did not want to be with Father in North Carolina. Mother called law enforcement. C.S. reiterated that she did not feel safe at Father's home, but she was unable to articulate why. Later in the day, however, C.S. reported to law enforcement that she felt safe at Father's home and she was not scared of him.

6

On January 16, 2024, the social worker spoke with Father about what happened in North Carolina. Father had to be redirected multiple times because he attempted to discuss past referrals and social workers. He reported that he took C.S. with him to North Carolina to visit family, which Mother was aware of. He was unable to provide a direct answer when asked if he obtained permission from Mother to take C.S. to North Carolina. He stated that he had a right to take C.S. wherever he wanted and reported that C.S. engaged in self-harm in North Carolina only because Mother called her and manipulated her over the phone. He claimed C.S. was suspended from school for two days because she had been caught selling vapes and mushrooms to her friends at school and that he had found someone qualified to provide therapy to C.S.

Mother denied giving Father permission to take C.S. to North Carolina and believed Father kidnapped C.S. under the guise of taking her to dinner for one hour. She admitted that she urged C.S. to go out to dinner with Father. Subsequently, C.S. called Mother and told her that she was on a plane but that Father would not allow her to reveal where they were going. Mother and I.S. then left for Colombia because they had to "sign papers for the maternal grandmother to come back to the United States." Mother continued to monitor C.S.'s location electronically, and eventually located the hotel where Father and C.S. were staying. Mother was able to get a hold of Father and a paternal uncle, and learned that C.S. had cut herself. Mother contacted law enforcement for assistance. Mother noted that Father had been diagnosed with schizophrenia

7

approximately three to four years prior, although she stated that he would never admit the diagnoses.

When the social worker spoke with Father again, Father presented with "pressured speech and tangential thinking as evidenced by his rapid speech patterns and lack of direct response to [the social worker's]. . . multiple attempts to gain information as to the children's whereabouts." Father was agitated and "hyper-fixated" on the idea that the social worker had not yet viewed or read all of the research and videos he had sent to her. He said that he wanted to educate the social worker on "'something that is so complex,'" became agitated again and asked to speak with someone higher up who was qualified and who had obtained their doctorate degree.

DPSS's further investigation revealed that the parents had been associated with 20 CPS investigations, including those received during the current investigation, due to ongoing domestic violence between the parents, the parents' differing parenting styles, and Father's mental health issues. During an investigation in May 2023, Mother confirmed taking C.S. to be evaluated at Riverside Community Hospital, ETS, and Mental Urgent Care. C.S. was admitted to a hospital for three days. Father expressed concern for C.S.'s mental health, indicating Mother was psychologically abusing the children and aligning them against him. During an investigation in September 2023, C.S. indicated that her self-harming behaviors were triggered by Father, as he yelled and drank too much, and forced her to visit him when she did not want to do so. She used coping skills learned in therapy while receiving mental health treatment but reverted back to self-

harm when therapeutic services ended. DPSS recommended that the visits between Father and C.S. be directed by a qualified mental health professional in a therapeutic setting due to concerns regarding the child's claims that she would harm herself in Father's care. The girls were taken into protective custody and eventually placed together in a resource family home.

On January 22, 2024, a petition was filed on behalf of the girls pursuant to Welfare and Institutions Code, section 300, subdivision[3] (b) (failure to protect). The petition was amended several times thereafter.

On January 23, 2024, the juvenile court formally detained the girls from parental custody, and ordered that visitation between C.S. and Father was to occur only in a therapeutic setting and at the child's discretion. The court noted that C.S. was not to be forced to have contact with Father. Due to the information in the reports, the court ordered no visitation between I.S. and Father.

On February 1, 2024, Father demanded to have visits with C.S. The following day, the social worker asked C.S. about visits with her father. C.S. stated that she did not want to visit at that time, but indicated that she would think about it. The social worker informed C.S. that when she was ready to have visits, the social worker would set them up. The social worker thereafter told Father about C.S.'s wishes concerning visitation with him.

---

[3] Unless otherwise noted, all statutory references are to Welfare and Institutions Code.

9

The social worker spoke with C.S. again on February 16, 2024, about visitation with her father. C.S. stated that she wanted to visit Father, and the social worker attempted to set up a visit.

At a hearing on March 4, 2024, DPSS requested that the visitation order as to C.S. be modified so that visitation did not have to occur in a therapeutic setting because C.S. was refusing therapeutic services but wanted visits. DPSS wanted to facilitate visitation between C.S. and Father without forcing C.S. into therapy. The juvenile court authorized supervised visitation between C.S. and Father that did not have to occur in a therapeutic setting.

On March 4, 2024, the social worker submitted paperwork to set up Father's visits at DPSS's office. The first visit was scheduled for March 7, 2024, but Father was upset and did not agree when he was given the rules for the visits. The social worker explained that the rules were the same for all parents. Father canceled the visit stating he had an emergency to deal with. The next visit was scheduled for March 14, 2024. The social worker noted that C.S. had not cut herself since she had been in placement.

The jurisdictional/dispositional hearing was held on March 11, 2024. The juvenile court found true the allegations in the second amended petition, declared the girls dependents of the court, removed them from the physical custody of the parents, and provided the parents with reunification services. As to Father's visitation with the girls, the court ordered no visitation between Father and I.S., and visitation between Father and C.S. to occur only in a therapeutic setting and at the discretion of the child. (Italics

added.)  The court also ordered both parents to participate in a psychological evaluation for case planning purposes.  The court authorized "increased parenting time up to placement for both parents, subject to case plan compliance and progress and benefit."

Father timely appealed in May 2024.  In January 2025, we reversed in part and affirmed in part, and remanded for further proceedings to determine whether visitation with Father is detrimental to C.S., or, in the alternative, to condition the visitation on Father's completion of a psychological evaluation and any recommended treatment, and the approval of the child's therapist.  (*In re I.S.*, *supra*, E083846)  We otherwise affirmed the jurisdictional/dispositional orders.  (*Ibid*.)

Two days after the jurisdictional/dispositional hearing, Father visited C.S.  Father tried to hug C.S., but she refused and said he looked ugly.  C.S. ended the visit an hour early and told Father she wanted to visit him again, but only for an hour.  However, C.S. refused to visit Father at the next two scheduled visits, on March 28, 2024, and April 4, 2024.

Although C.S. visited Father on April 18, 2024, she cut the visit short and left, then refused to visit him the following week, and refused again on May 2 and 9, 2024.  By June 2024, C.S. claimed she had given Father too many chances and did not want to see him again, but a month later she said she might want to visit him again.

On August 2, 2024, C.S. told the social worker that Father was a "'weirdo'" who had so much anxiety that it overwhelmed her and made her not want to visit him.  About a week later, however, C.S. agreed to visit Father once per week after he agreed to return

11

her dog, which she had asked him to do since March 2024. When C.S. visited Father on August 8, 2024, she wanted to leave and left after refusing to hug Father. By October 2024, however, their visits increased (though they remained supervised), and they appeared to go well.

On November 25, 2024, the juvenile held a contested six-month review hearing, during which Father and the social worker testified. The social worker testified that, although Father appeared committed to completing his case plan and was making progress, the social worker still had safety concerns and did not support Father having unsupervised visits. Specifically, the social worker was concerned that Father continued to deny the allegations that led to the dependency, which the juvenile court had already found true. And although Father had participated in services, he had not taken responsibility for his actions, namely, his violence against I.S. and alcohol abuse, both of which he continued to deny.

The juvenile court stated that, after considering Father's and the social worker's testimony, it was adopting DPSS's recommended findings and orders, including the finding that returning C.S. to Father's care would be detrimental. The court then ordered continued reunification services for Father, placed the children in Mother's care, and ordered reunification services for her. Father timely appealed.

III.

DISCUSSION

Father argues (1) the juvenile court erred by failing to state the basis for its finding that returning C.S. to his care would be detrimental to her and (2) substantial evidence does not support its detriment finding.

At the six-month review hearing, the juvenile court must return the child to parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (§ 366.21, subd (e)(1).) When making its findings, the juvenile court must "specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental."  (§ 366.21, subd. (e)(2).)

Father contends the juvenile court failed to "specify the factual basis" for its finding that C.S. should not be returned to his care, in violation of section 366.21, subdivision (e)(2).  After the juvenile court orally stated its ruling at the six-month hearing that C.S. would not be returned to Father's care, he did not object.  Nor did Father ask the juvenile court to "specify the factual basis" for its orders or ask for a more detailed finding of some kind.  By failing to object at all, Father forfeited his argument that the juvenile court violated section 366.21, subdivision (e)(2). (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re S.C.* (2006) 138 Cal.App.4th 396, 406.)

13

At the six-month review hearing, the juvenile court must return the dependent child to the custody of the parent unless it determines, by a preponderance of the evidence, that returning the child would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.22, subd. (a); *In re E.D.* (2013) 217 Cal.App.4th 960, 965.)

"[T]he notion of detriment is at best a nebulous standard that depends on the context of the inquiry. . . . 'It cannot mean merely that the parent in question is less than ideal . . . .' Rather, the risk of detriment must be *substantial*, such that [the proposed action] represents some danger to the child's physical or emotional well-being." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.)

"In determining whether it would be detrimental to return the child at the [six-] month review, the court must consider whether the parent participated regularly in any treatment program set forth by the plan, the 'efforts or progress' of the parent, and the 'extent' to which the parent 'cooperated and availed himself or herself of services provided.'" (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) When a parent has complied with the case plan by "showing up for counseling or therapy or parenting classes, or what have you," the question remains whether the case plan programs have achieved their intended result, "that is, whether the counseling, therapy or parenting classes are doing any good." (*Ibid.*) In particular, the juvenile court must "consider the efforts or progress the parent has made toward eliminating the conditions

14

that led to the child's out-of-home placement." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

We review the juvenile court's detriment finding for substantial evidence. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.) Substantial evidence "means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." (*In re E.D.*, *supra*, 217 Cal.App.4th at p. 966.) When conducting this substantial evidence review, "we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the trial court's order." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1401.)

Substantial evidence supports the juvenile court's detriment finding here. To begin with, C.S. repeatedly reported that Father caused her anxiety, which caused her to not want to visit him. When she did visit him, she often cut visits short and expressed negative feelings toward him. C.S. thus was not convinced that Father could be the caregiver he used to be.

On top of C.S.'s concerns, the social worker reported and testified that returning C.S. to Father's care would be detrimental to her. The social worker unambiguously testified at the six-month hearing that he was concerned for C.S.'s safety if Father's visits were unsupervised, largely because Father he continued to refuse to take responsibility for his behavior that led to this dependency case. Despite Father's progress with his case plan, Father continued to deny the sustained allegations that led to C.S.'s removal, including his being physically aggressive with I.S. and abusing alcohol. The social

15

worker thus testified that Father's failure to take responsibility for his actions made the social worker concerned that Father would act in a similarly inappropriate manner with C.S. if she were returned to his care.

In other words, there was substantial evidence that Father had not made sufficient progress "toward eliminating the conditions that led to [C.S.'s] out-of-home placement." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.)  For that reason, we conclude substantial evidence supports the juvenile court's finding that returning C.S. to Father's care would place her at a substantial risk of detriment.

## IV.

## DISPOSITION

The juvenile court's dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

RAPHAEL
J.